## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
CASE NO.

AUDEMARS PIGUET HOLDING SA,
BREITLING U.S.A., INC.,
LVMH SWISS MANUFACTURES, S.A.,
HERMÈS INTERNATIONAL, and
OMEGA SA,

                   Plaintiffs,

vs.

THE INDIVIDUALS, PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A" and
DOES 1-10,

                   Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs, Audemars Piguet Holding SA, Breitling U.S.A., Inc., Hermès International,

LVMH Swiss Manufactures, S.A., and Omega SA, (collectively "Plaintiffs")[1], hereby sue

Defendants, the Individuals, Partnerships or Unincorporated Associations identified on Schedule

"A" hereto and Does 1-10 (collectively "Defendants"). Defendants are promoting, selling,

offering for sale and/or distributing goods bearing counterfeits and confusingly similar imitations

of Plaintiffs' respective trademarks within this district through at least the fully interactive,

---

[1] Each Plaintiff is a member of the Federation of the Swiss Watch Industry FH, a non-profit trade association with over 500 members, representing more than 90% of all Swiss watch manufacturers, which was founded in 1924 to contribute to the protection and development of the Swiss Watch Industry. In 1999, members of the Federation of the Swiss Watch Industry FH, including Plaintiffs', established the Anti-Counterfeiting Group, which was created to combat common sources of counterfeit goods which cause harm to its members' respective brands individually and to the Swiss watch industry in its entirety, which results in further harm to each member's brand. Since 1999, the Federation of the Swiss Watch Industry FH, through its anti-counterfeiting division, has worked with international law enforcement and government agencies to conduct raids and investigations of counterfeit operations, as well as raise public awareness regarding the issue.

commercial Internet websites operating under the domain names identified on Schedule "A" hereto (the "Subject Domain Names"). In support of their claims, Plaintiffs allege as follows:

## JURISDICTION AND VENUE

1.      This is an action for federal trademark counterfeiting and infringement, false designation of origin, cybersquatting, and common law unfair competition pursuant to 15 U.S.C. §§ 1114, 1116, 1121, 1125(a), 1125(d), and The All Writs Act, 28 U.S.C. § 1651(a). Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claim because that claim is so related to the federal claims that it forms part of the same case or controversy.

2.      Defendants are subject to personal jurisdiction in this district because they operate commercial websites accessible in this district and direct business activities towards consumers throughout the United States, including within the State of Florida and this district through at least the fully interactive commercial Internet websites operating under the Subject Domain Names.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendants are, upon information and belief, engaged in infringing activities and causing harm within this district by advertising, offering to sell, and/or selling infringing products into this district.

## THE PLAINTIFFS

4.      Plaintiff Audemars Piguet Holding SA (Audemars Piguet) is a societe anonyme organized under the laws of Switzerland, having its principal office at Route de France 16, CH-1348 Le Brassus, Switzerland.

5.      Plaintiff Breitling U.S.A., Inc. ("Breitling USA") is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in the United States located at 206 Danbury Road Hangar 7, Wilton, Connecticut 06897.

6.      Plaintiff Hermès International ("Hermès") is a corporation organized and existing under the laws of France with its principal place of business located at 24 Rue Du Faubourg Saint-Honore, Paris, France 75008.

7.      Plaintiff LVMH Swiss Manufactures, S.A. ("LVMH") is a societe anonyme organized under the laws of Switzerland with a principal place of business at 6A, Rue Louis-Joseph Chevrolet, CH- 2300 La Chaux-de-Fonds, Switzerland.

8.      Plaintiff Omega SA ("Omega") is a societe anonyme organized under the laws of Switzerland with its principal place of business located at 96 rue Jakob Stampfli, Bienne, Switzerland.

9.      Like many other famous trademark owners, Plaintiffs suffer ongoing daily and sustained violations of their respective trademark rights at the hands of counterfeiters and infringers, such as Defendants herein, who wrongfully reproduce and counterfeit Plaintiffs' individual trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits.

10.     In order to combat the indivisible harm caused by the combined actions of Defendants and others engaging in similar conduct, each year Plaintiffs expend significant amounts of money in connection with trademark enforcement efforts, including legal fees, investigative fees, and support mechanisms for law enforcement such as field training guides and seminars. The recent explosion of counterfeiting over the Internet has created an environment which requires companies such as Plaintiffs to file a large number of lawsuits, often it later turns

out, against the same individuals and groups, in order to protect both consumers and themselves from the ill effects of confusion and the erosion of the goodwill connected to Plaintiffs' respective brands.

## THE DEFENDANTS

11.     Defendants operate through domain names registered with registrars in multiple countries and are comprised of individuals, partnerships and/or business entities of unknown makeup, whom, upon information and belief, reside and/or operate in foreign jurisdictions. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b). Defendants target their business activities towards consumers throughout the United States, including within this district through the simultaneous operation of at least the fully interactive commercial websites existing under the Subject Domain Names.

12.     Upon information and belief, Defendants use aliases in conjunction with the operation of their businesses, including but not limited to those identified by the same Defendant Number on Schedule "A" hereto.

13.     Plaintiffs are presently unaware of the true names of Does 1-10, although they are generally identified as the managing agents and/or co-conspirators of Defendants.  Plaintiffs will amend this Complaint upon discovery of the identities of such fictitious Defendants.

14.     Upon information and belief, Defendants are directly and personally contributing to, inducing and engaging in the sale of counterfeit branded products as alleged herein, often times as partners, co-conspirators and/or suppliers.

15.     Defendants are part of an ongoing scheme to create and maintain an illegal marketplace enterprise on the World Wide Web, which (i) confuses consumers regarding the source of Defendants' goods for profit, and (ii) expands the marketplace for illegal, counterfeit

4

versions of Plaintiffs' branded goods while shrinking the legitimate marketplace for Plaintiffs' genuine branded goods.  The natural and intended byproduct of Defendants' actions is the erosion and destruction of the goodwill associated with Plaintiffs' respective famous names and trademarks, as well as the destruction of the legitimate market sector in which they operate

16.     Defendants are the past and present controlling forces behind the operation of commercial Internet websites operating under at least the Subject Domain Names.

17.     Upon information and belief, Defendants directly engage in unfair competition with Plaintiffs by (i) advertising, offering for sale, and selling goods bearing counterfeits and infringements of Plaintiffs' individual trademarks to consumers within the United States and this district through at least the fully interactive, commercial websites operating under the Subject Domain Names and additional domain names and websites not yet known to Plaintiffs and (ii) creating and maintaining an illegal marketplace enterprise for the purpose of diverting business from Plaintiffs' legitimate marketplace for their genuine goods. Defendants have purposefully directed some portion of their illegal activities towards consumers in the State of Florida through the advertisement, offer to sell, sale, and/or shipment of counterfeit branded goods into the State, and by operating an illegal marketplace enterprise which impacts and interferes with commerce throughout the United States, including within the State of Florida.

18.     Upon information and belief, Defendants have registered, established or purchased, and maintained the Subject Domain Names and the websites operating thereunder. Upon information and belief, many Defendants have engaged in fraudulent conduct with respect to the registration of the Subject Domain Names by providing false and/or misleading information to their various registrars during the registration or maintenance process. Upon

information and belief, many Defendants have registered and maintained the Subject Domain Names for the sole purpose of engaging in illegal counterfeiting activities.

19.     Upon information and belief, Defendants will continue to register or acquire new domain names for the purpose of selling and/or offering for sale goods bearing counterfeit and confusingly similar imitations of Plaintiffs' respective trademarks unless preliminarily and permanently enjoined. Moreover, upon information and belief, Defendants will continue to maintain and grow their illegal marketplace enterprise at Plaintiffs' expense unless preliminarily and permanently enjoined.

20.     Defendants' entire Internet-based website businesses amount to nothing more than illegal operations established and operated in order to infringe the intellectual property rights of Plaintiffs and others.

21.     Defendants' business names, i.e., the Subject Domain Names, and any other domain names used in connection with the sale of counterfeit and infringing goods bearing Plaintiffs' respective trademarks are essential components of Defendants' counterfeiting and infringing activities and are the means by which Defendants further their counterfeiting and infringing scheme and cause harm to Plaintiffs.  Moreover, Defendants are using Plaintiffs' respective famous names and trademarks to drive Internet consumer traffic to their websites operating under the Subject Domain Names, thereby creating and increasing the value of the Subject Domain Names and decreasing the size and value of Plaintiffs' legitimate consumer marketplace at Plaintiffs' expense.

## COMMON FACTUAL ALLEGATIONS

### Audemars Piguet's Trademark Rights

22.     Audemars Piguet is the owner of the following trademark registered on the

Principal Register of the United States Patent and Trademark Office (the "AUDEMARS

PIGUET Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| AUDEMARS PIGUET | 1,591,934 | April 17, 1990 | IC 014 - watches, clocks, stop watches, time recorders, chronometers, chronographs, watch movements, and parts of all the foregoing. |

The AUDEMARS PIGUET Mark is used in connection with the manufacture and distribution of

high quality goods in the categories identified above. A true and correct copy of the Certificate

of Registration for the AUDEMARS PIGUET Mark is attached hereto as Composite Exhibit

"A."

23.     The AUDEMARS PIGUET Mark has been used in interstate commerce to

identify and distinguish Audemars Piguet and related companies' high quality goods for an

extended period of time and serves as a symbol of Audemars Piguet's quality, reputation and

goodwill.

24.     Further, Audemars Piguet and related companies have expended substantial time,

money and other resources developing, advertising and otherwise promoting the AUDEMARS

PIGUET Mark. Audemars Piguet and related companies have spent millions of dollars to

extensively advertise and promote products under the AUDEMARS PIGUET Mark in

magazines, newspapers, on the Internet and in other media worldwide, including the official

Audemars Piguet website, www.audemarspiguet.com. The AUDEMARS PIGUET Mark

qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

25.     Audemars Piguet and related companies have extensively used, advertised and

promoted the AUDEMARS PIGUET Mark in the United States in connection with the sale of

high quality watches and related goods. As a result, the AUDEMARS PIGUET Mark is among

the most widely recognized trademarks in the United States, and the trademark has achieved

secondary meaning as an identifier of high quality goods.

26.     Audemars Piguet has carefully monitored and policed the use of the

AUDEMARS PIGUET Mark and has never assigned or licensed the AUDEMARS PIGUET

Mark to any of the Defendants in this matter.

27.     Genuine goods bearing the AUDEMARS PIGUET Mark are widely legitimately

advertised and promoted by Audemars Piguet and related companies, authorized distributors and

unrelated third parties via the Internet.  Over the course of the past several years, visibility on the

Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become

increasingly important to Audemars Piguet's overall marketing and consumer education efforts.

Thus, Audemars Piguet and related companies expend significant monetary resources on Internet

marketing and consumer education, including search engine optimization ("SEO") strategies.

Those strategies allow Audemars Piguet and its authorized retailers to fairly and legitimately

educate consumers about the value associated with the AUDEMARS PIGUET Mark and the

goods sold thereunder.

### Breitling USA's Trademark Rights

28.     Breitling USA is the owner of the following trademark registered on the Principal

Register of the United States Patent and Trademark Office (the "BREITLING Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|---------------------|-------------------|---------------|
| BREITLING | 2,964,474 | July 5, 2005 | IC 014 - horological instruments and chronometrical instruments, namely, watches, wrist-watches straps for wrist-watches, watchcases, clocks, chronographs, chronometers, and parts thereof.<br><br>IC 025 - caps, scarves t-shirts, shirts, sweatshirts, polo shirts, jackets, pilot jackets, bomber's jackets, parka jackets. |

The BREITLING Mark is used in connection with the manufacture and distribution of high quality goods in the categories identified above. A true and correct copy of the Certificate of Registration for the BREITLING Mark is attached hereto as Composite Exhibit "B."

29.     The BREITLING Mark has been used in interstate commerce to identify and distinguish Breitling USA's high quality goods for an extended period of time and serves as a symbol of Breitling USA's quality, reputation and goodwill.

30.     Further, Breitling USA and related companies have expended substantial time, money and other resources developing, advertising and otherwise promoting the BREITLING Mark. Breitling USA and related companies have spent millions of dollars to extensively advertise and promote products under the BREITLING Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Breitling website, www.breitling.com. The BREITLING Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

31.     Breitling USA has extensively used, advertised and promoted the BREITLING Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the BREITLING Mark is among the most widely recognized trademarks in the

United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

32.     Breitling USA has carefully monitored and policed the use of the BREITLING Mark and has never assigned or licensed the BREITLING Mark to any of the Defendants in this matter.

33.     Genuine goods bearing the BREITLING Mark are widely legitimately advertised and promoted by Breitling USA and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Breitling USA's overall marketing and consumer education efforts. Thus, Breitling USA and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Breitling USA and its authorized retailers to fairly and legitimately educate consumers about the value associated with the BREITLING Mark and the goods sold thereunder.

**Hermès' Trademark Rights**

34.     Hermès is the owner of the following trademark registered on the Principal Register of the United States Patent and Trademark Office (the "HERMÈS Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| HERMES | 369,271 | July 18, 1939 | IC 014 - clocks and watches. |

The HERMÈS Mark is used in connection with the manufacture and distribution of high quality goods in the category identified above. A true and correct copy of the Certificate of Registration for the HERMÈS Mark is attached hereto as Composite Exhibit "C."

35.     The HERMÈS Mark has been used in interstate commerce to identify and distinguish Hermès' high quality goods for an extended period of time and serves as a symbol of Hermès' quality, reputation and goodwill.

36.     Further, Hermès and related companies have expended substantial time, money and other resources developing, advertising and otherwise promoting the HERMÈS Mark. Hermès and related companies have spent millions of dollars to extensively advertise and promote products under the HERMÈS Mark in magazines, newspapers, in stores, on the Internet and in other media worldwide, including the official Hermès website, www.hermes.com. The HERMÈS Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

37.     Hermès has extensively used, advertised and promoted the HERMÈS Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the HERMÈS Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

38.     Hermès has carefully monitored and policed the use of the HERMÈS Mark and has never assigned or licensed the HERMÈS Mark to any of the Defendants in this matter.

39.     Genuine goods bearing the HERMÈS Mark are widely legitimately advertised and promoted by Hermès and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Hermès' overall marketing and consumer education efforts. Thus, Hermès and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Hermès and its authorized

retailers to fairly and legitimately educate consumers about the value associated with the

HERMÈS Mark and the goods sold thereunder

**LVMH's Trademark Rights**

40.     LVMH is the owner of the following trademark registered on the Principal

Register of the United States Patent and Trademark Office (the "TAG HEUER Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|---------------------|-------------------|---------------|
| TAG HEUER | 2,281,436 | September 28, 1999 | IC 014 - Clocks, watches and parts thereof. |

The TAG HEUER Mark is used in connection with the manufacture and distribution of high

quality goods in the category identified above. A true and correct copy of the Certificate of

Registration for the TAG HEUER Mark is attached hereto as Composite Exhibit "D."

41.     The TAG HEUER Mark has been used in interstate commerce to identify and

distinguish LVMH's high quality goods for an extended period of time and serves as a symbol of

LVMH's quality, reputation and goodwill.

42.     Further, LVMH and related companies have expended substantial time, money

and other resources developing, advertising and otherwise promoting the TAG HEUER Mark.

LVMH and related companies have spent millions of dollars to extensively advertise and

promote products under the TAG HEUER Mark in magazines, newspapers, on the Internet and

in other media worldwide, including the official TAG HEUER website, www.tagheuer.com. The

TAG HEUER Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

43.     LVMH has extensively used, advertised and promoted the TAG HEUER Mark in

the United States in connection with the sale of high quality watches and related goods. As a

result, the TAG HEUER Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

44.     LVMH has carefully monitored and policed the use of the TAG HEUER Mark and has never assigned or licensed the TAG HEUER Mark to any of the Defendants in this matter.

45.     Genuine goods bearing the TAG HEUER Mark are widely legitimately advertised and promoted by LVMH and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to LVMH's overall marketing and consumer education efforts. Thus, LVMH and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow LVMH and its authorized retailers to fairly and legitimately educate consumers about the value associated with the TAG HEUER Mark and the goods sold thereunder.

**Omega's Trademark Rights**

46.     Omega is the owner of the following trademark registered on the Principal Register of the United States Patent and Trademark Office (the "OMEGA Mark"):

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| **OMEGA** | 566,370 | November 4, 1952 | IC 014 - watches and parts thereof. |

The OMEGA Mark is used in connection with the manufacture and distribution of high quality goods in the category identified above. A true and correct copy of the Certificate of Registration for the OMEGA Mark is attached hereto as Composite Exhibit "E."

47.     The OMEGA Mark and related companies have been used in interstate commerce to identify and distinguish Omega's high quality goods for an extended period of time and serves as a symbol of Omega's quality, reputation and goodwill.

48.     Further, Omega has expended substantial time, money and other resources developing, advertising and otherwise promoting the OMEGA Mark.  Omega and related companies have spent millions of dollars to extensively advertise and promote products under the OMEGA Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Omega website, www.omegawatches.com. The OMEGA Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

49.     Omega has extensively used, advertised and promoted the OMEGA Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the OMEGA Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

50.     Omega has carefully monitored and policed the use of the OMEGA Mark and has never assigned or licensed the OMEGA Mark to any of the Defendants in this matter.

51.     Genuine goods bearing the OMEGA Mark are widely legitimately advertised and promoted by Omega and related companies, authorized distributors and unrelated third parties via the Internet.  Over the course of the past five to seven years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Omega's overall marketing and consumer education efforts. Thus, Omega and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Omega and its authorized

14

retailers to fairly and legitimately educate consumers about the value associated with the OMEGA Mark and the goods sold thereunder.

**Defendants' Infringing Activities**

52.     Upon information and belief, Defendants are promoting and advertising, distributing, selling and/or offering for sale goods in interstate commerce bearing counterfeit and infringing trademarks that are exact copies of the AUDEMARS PIGUET Mark, BREITLING Mark, HERMES Mark, TAG HEUER Mark, and/or OMEGA Mark  (collectively, "Plaintiffs' Marks"), including without limitation, watches (the "Counterfeit Goods") through the fully interactive commercial websites operating under the Subject Domain Names.  True and correct copies of the web pages reflecting samples of the Internet websites operating under the Subject Domain Names are attached hereto as Composite Exhibit "F." Specifically, upon information and belief, Defendants are using identical copies of Plaintiffs' Marks for different quality goods. Plaintiffs have used their respective Marks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Plaintiffs' goods.

53.     Upon information and belief, Defendants' Counterfeit Goods are of a quality substantially different than that of Plaintiffs' respective, genuine goods.  Defendants, upon information and belief, are actively using, promoting and otherwise advertising, distributing, selling and/or offering for sale substantial quantities of their Counterfeit Goods with the knowledge and intent that such goods will be mistaken for the genuine quality goods offered for sale by Plaintiffs despite Defendants' knowledge that they are without authority to use Plaintiffs' Marks.  The net effect of Defendants' actions will cause confusion of consumers at the time of initial interest, sale, and in the post-sale setting, who will believe Defendants' Counterfeit Goods are genuine goods originating from, associated with, and approved by Plaintiffs.

15

54.     Defendants advertise their Counterfeit Goods for sale to the consuming public via at least their websites operating under the Subject Domain Names.  In so advertising these goods, Defendants improperly and unlawfully use Plaintiffs' Marks without Plaintiffs' permission. Indeed, Defendants herein misappropriated Plaintiffs' advertising ideas and methods of doing business with regard to the advertisement and sale of Plaintiffs' respective, genuine goods.  Upon information and belief, the misappropriation of Plaintiffs' advertising ideas in the form of Plaintiffs' Marks is, in part, the proximate cause of harm to Plaintiffs.

55.     As part of their overall infringement and counterfeiting scheme, Defendants are, upon information and belief, all concurrently employing substantially similar, and often times coordinated, paid advertising and SEO strategies based, in large measure, upon an illegal use of counterfeits and infringements of Plaintiffs' Marks. Specifically, Defendants are using counterfeits of Plaintiffs' respective famous names and Plaintiffs' Marks in order to make their websites selling illegal goods appear more relevant and attractive to search engines across an array of search terms. By their actions, Defendants have created an illegal marketplace operating in parallel to the legitimate marketplace for Plaintiffs' respective genuine goods. Defendants are causing concurrent and indivisible harm to Plaintiffs and the consuming public by (i) depriving Plaintiffs of their right to fairly compete for space within search engine results and reducing the visibility of Plaintiffs' respective genuine goods on the World Wide Web, (ii) causing an overall degradation of the value of the goodwill associated with Plaintiffs' Marks, (iii) increasing Plaintiffs' overall cost to market their goods and educate consumers about their brands via the Internet, and (iv) maintaining an illegal marketplace enterprise which perpetuates the ability of Defendants and future entrants to that marketplace to confuse consumers and harm Plaintiffs with impunity.

56.     Upon information and belief, Defendants are concurrently conducting and targeting their counterfeiting and infringing activities toward consumers and causing harm within this district and elsewhere throughout the United States.  As a result, Defendants are defrauding Plaintiffs and the consuming public for Defendants' own benefit.

57.     Upon information and belief, at all times relevant hereto, Defendants in this action had full knowledge of Plaintiffs' respective ownership of Plaintiffs' Marks, including their respective, exclusive rights to use and license such intellectual property and the goodwill associated therewith.

58.     Defendants' use of Plaintiffs' Marks, including the promotion and advertisement, reproduction, distribution, sale and offering for sale of their Counterfeit Goods, is without Plaintiffs' consent or authorization.

59.     Defendants are engaging in the above-described illegal counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Plaintiffs' rights for the purpose of trading on Plaintiffs' respective goodwill and reputations.  If Defendants' intentional counterfeiting and infringing activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

60.     Defendants' above identified infringing activities are likely to cause confusion, deception and mistake in the minds of consumers, the public, and the trade before, during, and after the time of purchase.  Moreover, Defendants' wrongful conduct is likely to create a false impression and deceive customers, the public, and the trade into believing there is a connection or association between Plaintiffs' respective genuine goods and Defendants' Counterfeit Goods, which there is not.

61.     Further, upon information and belief, certain Defendants have registered their respective Subject Domain Names, using marks which are nearly identical and/or confusingly similar to at least one of Plaintiffs' Marks, (collectively the "Cybersquatted Subject Domain Names").

62.     Upon information and belief, Defendants have registered and/or used the Cybersquatted Subject Domain Names with the bad faith intent to profit from Plaintiffs' respective Marks.

63.     Defendants do not have, nor have they ever had, the right or authority to use Plaintiffs' Marks.  Further, Plaintiffs' Marks have never been assigned or licensed to be used on any of the websites operating under the Cybersquatted Subject Domain Names.

64.     Upon information and belief, Defendants have provided false and/or misleading contact information when applying for the registration of the Cybersquatted Subject Domain Names, or have intentionally failed to maintain accurate contact information with respect to the registration of the Cybersquatted Subject Domain Names.

65.     Upon information and belief, Defendants have never used any of the Cybersquatted Subject Domain Names in connection with a bona fide offering of goods or services.

66.     Upon information and belief, Defendants have not made any bona fide non-commercial or fair use of Plaintiffs' Marks on a website accessible under the any of Cybersquatted Subject Domain Names.

67.     Upon information and belief, Defendants have intentionally incorporated Plaintiffs' respective Marks in their domain names to divert consumers looking for Plaintiffs' respective Internet websites to their own Internet websites for commercial gain.

18

68.     Given the visibility of Defendants' various websites and the similarity of their actions, including their SEO activities, it is clear Defendants are either related or, at a minimum, cannot help but know of each other's existence and the damage likely to be caused to Plaintiffs as a result of Defendants' concurrent actions.

69.     Although some Defendants may be acting independently, they may properly be deemed to be acting in concert because they are combining the force of their actions to multiply the harm caused to Plaintiffs.

70.     Plaintiffs have no adequate remedy at law.

71.     Plaintiffs are suffering irreparable and indivisible injury and have suffered substantial damages as a result of Defendants' unauthorized and wrongful use of Plaintiffs' Marks. If Defendants' counterfeiting, infringing, cybersquatting, and unfairly competitive activities, and their illegal marketplace enterprise are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

72.     The harm and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of their Counterfeit Goods and by the creation, maintenance and very existence of Defendants' illegal marketplace enterprise.

## COUNT I - TRADEMARK COUNTERFEITING AND INFRINGEMENT PURSUANT TO § 32 OF THE LANHAM ACT (15 U.S.C. § 1114)

73.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 72 above.

74.     This is an action for trademark counterfeiting and infringement against Defendants based on their use of counterfeit and confusingly similar imitations of Plaintiffs'

Marks in commerce in connection with the promotion, advertisement, distribution, sale and/or offering for sale of the Counterfeit Goods.

75.     Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing goods, using counterfeits and/or infringements of one or more of Plaintiffs' Marks. Defendants are continuously infringing and inducing others to infringe Plaintiffs' Marks by using them to advertise, promote and sell counterfeit and infringing branded goods.

76.     Defendants' indivisible and concurrent counterfeiting and infringing activities are likely to cause and actually are causing confusion, mistake and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods.

77.     Defendants' unlawful actions have individually and jointly caused and are continuing to cause unquantifiable damage and irreparable harm to Plaintiffs and are unjustly enriching Defendants at Plaintiffs' expense.

78.     Defendants' above-described illegal actions constitute counterfeiting and infringement of Plaintiffs' Marks in violation of Plaintiffs' respective rights under § 32 of the Lanham Act, 15 U.S.C. § 1114.

79.     Plaintiffs have each suffered and will continue to suffer irreparable injury due to Defendants' above described activities if Defendants are not preliminarily and permanently enjoined.

### COUNT II - FALSE DESIGNATION OF ORIGIN
### PURSUANT TO § 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

80.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 72 above.

81.     Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of Plaintiffs' Marks have been widely advertised and offered for sale throughout the United States.

82.     Defendants' Counterfeit Goods bearing, offered for sale and sold using copies of Plaintiffs' Marks are virtually identical in appearance to each of Plaintiffs' respective, genuine goods.  However, Defendants' Counterfeit Goods are different in quality. Accordingly, Defendants' activities are likely to cause confusion in the trade and among the general public as to at least the origin or sponsorship of their Counterfeit Goods.

83.     Defendants, upon information and belief, have used in connection with their advertisement, offer for sale, and sale of the Counterfeit Goods, false designations of origin and false descriptions and representations, including words or other symbols and trade dress which tend to falsely describe or represent such goods and have caused such goods to enter into commerce with full knowledge of the falsity of such designations of origin and such descriptions and representations, all to Plaintiffs' detriment.

84.     Defendants have authorized infringing uses of Plaintiffs' Marks in Defendants' advertisement and promotion of their counterfeit and infringing branded goods.  Defendants have also misrepresented to members of the consuming public that the Counterfeit Goods being advertised and sold by them are genuine, non-infringing goods.

85.     Additionally, Defendants are using counterfeits and infringements of Plaintiffs' Marks in order to unfairly compete with Plaintiffs and others for space within search engine organic results, thereby jointly depriving Plaintiffs of a valuable marketing and educational tool which would otherwise be available to Plaintiffs and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web.

86.     Defendants' above-described actions are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

87.     Plaintiffs have no adequate remedy at law, and have each sustained indivisible injury and damage caused by Defendants' concurrent conduct. Absent an entry of an injunction by this Court, each Plaintiff will continue to suffer irreparable injury to their respective goodwill and business reputations, as well as monetary damages.

## COUNT III - CLAIM FOR RELIEF FOR CYBERSQUATTING UNDER §43(d) OF THE LANHAM ACT (15 U.S.C. §1125(d))
(Plaintiffs Audemars Piguet and Breitling USA only)

88.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 72 above.

89.     Upon information and belief, Defendants have acted with the bad faith intent to profit from the AUDEMARS PIGUET Mark and BREITLING Mark and the goodwill associated with the AUDEMARS PIGUET Mark and BREITLING Mark Marks by registering and using the Cybersquatted Subject Domain Names.

90.     The AUDEMARS PIGUET Mark and BREITLING Mark were each distinctive and famous at the time Defendants registered the Cybersquatted Subject Domain Names.

91.     The Cybersquatted Subject Domain Names are identical to, confusingly similar to or dilutive of at least one of the AUDEMARS PIGUET Mark and BREITLING Mark.

92.     Defendants' actions constitute cybersquatting in violation of §43(d) of the Lanham Act, 15 U.S.C. §1125(d).

93.     Plaintiffs Audemars Piguet and Breitling USA have suffered and will continue to suffer irreparable injury and damages due to the above described activities of Defendants if Defendants are not preliminarily and permanently enjoined.

## COUNT IV - COMMON LAW UNFAIR COMPETITION

94.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 72 above.

95.     This is an action against Defendants based on their (i) promotion, advertisement, distribution, sale and/or offering for sale of goods bearing marks which are virtually identical, both visually and phonetically, to Plaintiffs' Marks and (ii) creation and maintenance of an illegal, ongoing marketplace enterprise operating in parallel to the legitimate marketplace in which Plaintiffs sell their genuine goods, in violation of Florida's common law of unfair competition.

96.     Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing goods bearing counterfeits and infringements of Plaintiffs' Marks. Defendants are also using counterfeits and infringements of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for (i) space in search engine results across an array of search terms and (ii) visibility on the World Wide Web.

97.     Defendants' infringing activities are likely to cause and actually are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' products by their use of Plaintiffs' Marks.

98.     Plaintiffs have no adequate remedy at law and are suffering irreparable injury as a result of Defendants' actions.

## COUNT V - COMMON LAW TRADEMARK INFRINGEMENT

99.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 72 above.

100.    This is an action for common law trademark infringement against Defendants based on their promotion, advertisement, offering for sale, and sale of their Counterfeit Goods bearing Plaintiffs' Marks.  Plaintiffs are the owners of all common law rights in and to the Plaintiffs' Marks.

101.    Specifically, Defendants, upon information and belief, promoting and otherwise advertising, distributing, offering for sale, and selling goods bearing infringements of the Plaintiffs' Marks.

102.    Defendants infringing activities are likely to cause and actually are causing confusion, mistake and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods bearing the Plaintiffs' Marks.

103.    Plaintiffs have no adequate remedy at law and are suffering damages and irreparable injury as a result of Defendants' actions.

## PRAYER FOR RELIEF

104.    WHEREFORE, Plaintiffs demand judgment on all Counts of this Complaint and an award of equitable relief and monetary relief, jointly and severally, against Defendants as follows:

a.    Entry of temporary, preliminary and permanent injunctions pursuant to 15 U.S.C. § 1116 and Federal Rule of Civil Procedure 65, enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from manufacturing or causing to be manufactured, importing, advertising or promoting, distributing, selling or offering to sell their Counterfeit Goods; from infringing, counterfeiting, or diluting Plaintiffs' Marks, from using Plaintiffs' Marks, or any mark or trade dress similar thereto, in connection with the sale of any unauthorized goods; from using any logo, trade name

or trademark or trade dress that may be calculated to falsely advertise the services or goods of

Defendants as being sponsored by, authorized by, endorsed by, or in any way associated with

Plaintiffs; from falsely representing themselves as being connected with Plaintiffs, through

sponsorship or association, or engaging in any act that is likely to falsely cause members of the

trade and/or of the purchasing public to believe any goods or services of Defendants are in any

way endorsed by, approved by, and/or associated with Plaintiffs; from using any reproduction,

counterfeit, copy, or colorable imitation of Plaintiffs' Marks in connection with the publicity,

promotion, sale, or advertising of any goods sold by Defendants, including, without limitation,

watches; from affixing, applying, annexing or using in connection with the sale of any goods, a

false description or representation, including words or other symbols tending to falsely describe

or represent Defendants' goods as being those of Plaintiffs, or in any way endorsed by Plaintiffs

and from offering such goods in commerce; from engaging in search engine optimization

strategies using colorable imitations of Plaintiffs' respective name or trademarks; and from

otherwise unfairly competing with Plaintiffs.

      b.     Entry of temporary, preliminary and permanent injunctions pursuant to 28

U.S.C §1651(a), The All Writs Act, enjoining Defendants and all third parties from creating,

maintaining, operating, joining, participating in, including providing financial, technical or other

support to, the World Wide Web based illegal marketplace for the sale and distribution of non-

genuine goods bearing counterfeits of Plaintiffs' Marks.

      c.     Entry of an order that, upon Plaintiffs' request, those in privity with

Defendants and those with notice of the injunction, including any Internet search engines, Web

hosts, domain-name registrars, domain-name registries or administrators, financial institutions,

payment processors, and payment service providers that are provided with notice of the

injunction, cease facilitating access to any or all domain names and websites through which

Defendants engage in the promotion, offering for sale and/or sale of goods using counterfeits

and/or infringements of Plaintiffs' Marks.

        d.     Entry of an order that, upon Plaintiffs' request, the top level domain

(TLD) Registry for each of the Subject Domain Names or their administrators, including

backend registry operators or administrators, place the Subject Domain Names on Registry Hold

status for the remainder of the registration period for any such domain name, thus removing them

from the TLD zone files which link the Subject Domain Names, and any other domain names

being used and/or controlled by Defendants to engage in the business of marketing, offering to

sell, and/or selling goods bearing counterfeits and infringements of Plaintiffs' Marks, to the IP

addresses where the associated websites are hosted.

        e.     Entry of an order canceling for the life of the current registration or, at

Plaintiffs' election, transferring the Subject Domain Names and any other domain names used by

Defendants to engage in their counterfeiting of Plaintiffs' Marks at issue to Plaintiffs' control so

they may no longer be used for illegal purposes.

        f.     Entry of an order requiring Defendants to account to and pay Plaintiffs for

all profits and damages resulting from Defendants' trademark counterfeiting and infringing

activities and that the award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or, at

Plaintiffs' election with respect to Count I, that Plaintiffs be awarded statutory damages from

each Defendant in the amount of two million dollars ($2,000,000.00) per each counterfeit

trademark used and product sold, as provided by 15 U.S.C. §1117(c)(2) of the Lanham Act.

        g.     Entry of an order requiring the relevant Defendants to account to and pay

Plaintiffs for all profits and damages resulting from Defendants' cybersquatting activities and

that the award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or, at Plaintiffs'

election with respect to Count III, that Plaintiffs be awarded statutory damages from the relevant

Defendants in the amount of one hundred thousand dollars ($100,000.00) per pirated domain

name used as provided by 15 U.S.C. §1117(d) of the Lanham Act

        h.    Entry of an award of Plaintiffs' costs and reasonable attorneys' fees and

investigative fees associated with bringing this action.

        i.    Entry of an award of pre-judgment interest on the judgment amount.

        j.    Entry of an order for any further relief as the Court may deem just and

proper.

DATED: August 28, 2015.        Respectfully submitted,

        STEPHEN M. GAFFIGAN, P.A.

        By: **s:/Virgilio Gigante**/\_\_\_\_
        Stephen M. Gaffigan (Fla. Bar No. 025844)
        Virgilio Gigante (Fla. Bar No. 082635)
        T. Raquel Rodriguez-Albizu (Fla. Bar. No. 103372)
        401 East Las Olas Blvd., #130-453
        Ft. Lauderdale, Florida 33301
        Telephone: (954) 767-4819
        Facsimile: (954) 767-4821
        E-mail: stephen@smgpa.net
        E-mail: leo@smgpa.net
        E-mail: raquel@smgpa.net

        Attorneys for Plaintiffs

## SCHEDULE "A"
## DEFENDANTS BY NUMBER AND SUBJECT DOMAIN NAME

| Defendant Number | Defendant / Subject Domain Name |
|---|---|
| 1 | allswisswatch.eu |
| 1 | audemarspiguetreplica.us |
| 1 | bigbangreplica.com |
| 1 | bigbangreplica.net |
| 1 | breitlingreplicas.net |
| 1 | elitereplicawatch.eu |
| 1 | hotreplica.co |
| 1 | hublotreplicas.net |
| 1 | hublotreplicas.us |
| 1 | replicaexpert.co |
| 1 | replicahause.ca |
| 1 | replicahause.com.au |
| 1 | replicahause.es |
| 1 | replicahause.me |
| 1 | replicahause.nl |
| 1 | replicahouse.co |
| 1 | replicamaster.ca |
| 1 | replicaperfection.eu |
| 1 | replicaster.co |
| 1 | richreplica.co |
| 1 | swissclock.co |
| 1 | swissclock.eu |
| 1 | swissclock.me |
| 1 | swisskings.eu |
| 1 | swissreplica.me |
| 1 | thereplicahause.co |
| 1 | thereplicahause.com.au |
| 1 | topreplicas.co |
| 1 | watchrepublic.eu |
| 2 | alongwatches.com |
| 3 | asinewatches.com |
| 4 | bestwatches.cn |
| 4 | fakewatchchina.com |
| 5 | boxmontre.com |
| 6 | buywatcheshere.ru |
| 7 | cheapwatchchina.us |
| 8 | demontres.com |
| 9 | demo-watch.cn |

| 9 | demowatch.net |
|---|---|
| 9 | ffwatches.com |
| 9 | ftwatches.cn |
| 9 | owatcho.co |
| 9 | owatcho.com |
| 9 | owatchoo.net |
| 9 | perfwatches.com |
| 9 | watchescloud.org |
| 9 | watchesr.com |
| 9 | watchestoo.co |
| 9 | watchtoo.com |
| 9 | watchyo.net |
| 10 | eagerwatch.com |
| 11 | echowatch.ru |
| 12 | ensurewatch.com |
| 13 | eshotrelojes.com |
| 14 | fakewatchmall.com |
| 15 | fitreplica.com |
| 16 | getreplicas.com |
| 17 | hoowatch.com |
| 18 | idoloutlet.biz |
| 19 | idomontres.com |
| 20 | inwatchsale.net |
| 21 | jemontres.fr |
| 22 | jhcc.co.uk |
| 22 | kidsmoneyland.co.uk |
| 23 | justmontres.fr |
| 24 | kowatches.co |
| 25 | luxmall.su |
| 26 | luxorelogio.com |
| 27 | luxuhrende.com |
| 28 | luxuhrensite.com |
| 29 | luxurymy.ru |
| 30 | mowatch.cn |
| 31 | orologireplicait.com |
| 32 | perfectwatches.cn |
| 33 | pursevalley.cn |
| 33 | classicwatch.net |
| 33 | guccireplicawatch.com |
| 33 | knock-off-watches.com |
| 33 | replica-gucci-watches.com |
| 33 | swiss-made.co |
| 33 | swiss-watch.co |

| 34 | relojesmercado.com |
|----|----|
| 35 | relojesreplicas24h.com |
| 35 | newatchesail.com |
| 36 | rep8.net |
| 37 | replicahause.eu |
| 38 | replicahause.fr |
| 39 | replicahause.mx |
| 40 | replicamontres.com |
| 41 | replicasales.com |
| 42 | replicawatchespakistan.com.pk |
| 43 | replikasaat.gen.tr |
| 44 | replikeuhren.com |
| 45 | repliks.com |
| 46 | replux.ru |
| 47 | rolex-sell.com |
| 48 | royalwatch.com.pk |
| 49 | salewatches2.ru |
| 50 | snewatch.com |
| 51 | solidwatches.co.uk |
| 51 | coveymccormick.co.uk |
| 51 | ukfashionwatches.co.uk |
| 52 | standwatches.com |
| 53 | swissreplication.eu |
| 54 | takewatches.com |
| 55 | teresaduck.com |
| 56 | thereplicahause.fr |
| 57 | thuswatch.com |
| 58 | trustytime.ru |
| 59 | u2watchesale.com |
| 60 | uhrentoyou.com |
| 61 | uhrenvonale.com |
| 62 | uorderwatches.com |
| 63 | vcwatches.com |
| 64 | ventwatch.com |
| 64 | luxshop.su |
| 64 | luxusales.ru |
| 64 | made2u.su |
| 64 | replicaonline.co.uk |
| 64 | vastwatch.ru |
| 64 | vreplicas.ru |
| 64 | watchjust.su |
| 65 | volluhren.com |
| 66 | watchesaleoff.com |

| 66 | inwatchsale.ru |
|----|----------------|
| 67 | watchesalon.ru |
| 67 | watchesalon.com |
| 68 | watchesatpar.com |
| 69 | watchesdata.com |
| 69 | yewatchsale.com |
| 70 | watchgoing.fr |
| 70 | cnmontres.com |
| 70 | watchesgoing.com |
| 71 | watchesrail.com |
| 72 | watchesways.com |
| 73 | watchjust.org |
| 74 | whynotreplica.com |
| 75 | xclones.su |
| 76 | yeawatch.com |